# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS

TIMOTHY LEBLANC                             NO. 23-00045-BAJ-RLB

## RULING AND ORDER

Prior to June 2022, few defendants challenged the Constitutional limits of Congress's authority to disarm convicted felons. Those that did were sharply (and universally) rebuffed. *E.g.*, *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017) (summarily rejecting Second Amendment challenge to 18 U.S.C. § 922(g)(1)).

Enter *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, wherein the Supreme Court placed the burden squarely on the Government to justify the constitutionality of modern firearms restrictions against "this Nation's historical tradition of firearm regulation." 597 U.S. 1, 17, 142 S. Ct. 2111, 2126 (2022). "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (quotation marks omitted)).

Intended or not, *Bruen* threw open courthouse doors to Second Amendment challenges long since rejected, including even challenges to 18 U.S.C. § 922(g)(1), Congress's lifetime, blanket prohibition against convicted felons possessing firearms. And, not surprising to students (and scholars) of America's history of gun regulation (or lack thereof), "the constitutionality of § 922(g)(1) *after Bruen* is not clear or obvious." *United States v. EtchisonBrown*, No. 22-10892, 2023 WL 7381451, at *3 (5th

1

Cir. Nov. 7, 2023).

In this case, Defendant Timothy Leblanc—whose prior felony convictions include armed robbery—is charged with a single count of unlawful possession of a handgun in violation of § 922(g)(1). He now moves to dismiss this charge under *Bruen*, arguing that § 922(g)(1) is unconstitutional facially *and* "as applied" because it is incompatible with the Nation's historical tradition of firearms regulation. The Government responds that Mr. Leblanc's challenge is foreclosed by pre-*Bruen* decisions of the U.S. Court of Appeals for the Fifth Circuit, and that, in any event, § 922(g)(1) survives *Bruen*.

For reasons to follow, Mr. Leblanc's as-applied challenge will be granted and the Indictment against him will be dismissed with prejudice. In short, Mr. LeBlanc's case is not governed by pre-*Bruen* precedent because *Bruen* rendered this Circuit's prior Second Amendment authority "obsolete." *United States v. Rahimi*, 61 F.4th 443, 451 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023). Further, the Government has failed here to show "relevantly similar" historical analogues to justify § 922(g)(1)'s categorical disarmament of felons, as required by *Bruen*. *See Bruen*, 597 U.S. at 29. Recognizing, however, that some such historical analogues *may* yet exist, the Court does not reach Mr. LeBlanc's facial challenge.

## I.    BACKGROUND

On October 27, 2022, a Baton Rouge Police Department officer pulled over Mr. Leblanc for displaying a fake temporary license tag. (Doc. 30 at 1). Leblanc consented to a vehicle search, which yielded a Sig Sauer, P365 NRA, 9mm pistol. (*Id.*). Having previously acquired a felony record, Leblanc was arrested and charged in the

2

Nineteenth Judicial District Court for the Parish of East Baton Rouge, Louisiana ("Nineteenth JDC") with the state offense of possession of a firearm by a convicted felon, in violation of La. R.S. § 14:95.1. (Doc. 7 at 5). Leblanc's state court case remains pending. (*Id.*).

State authorities referred Leblanc's case to the U.S. Attorney's Office, and on May 24, 2023 the Grand Jury returned a single-count Indictment charging him with the federal offense of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1).

According to his Pretrial Services Report, Mr. Leblanc has at least three prior Louisiana convictions. (Doc. 7 at 4-5). These include a 2004 felony conviction for theft in excess of $500, in violation of La. R.S. § 14:67; a 2008 felony conviction for armed robbery, in violation of La. R.S. § 14:64; and a 2019 misdemeanor conviction for illegal carrying of weapons, in violation of La. R.S. § 14:95. (*Id.*). Leblanc was ultimately sentenced to two years imprisonment for his theft conviction; 15 years imprisonment for his armed robbery conviction; and six months imprisonment for his illegal weapons offense. (*Id.*). Finally, in addition to the pending Nineteenth JDC gun charge arising from the October 27 traffic stop (referenced above), Leblanc was charged in 2021 with obtaining a controlled dangerous substance by fraud, in violation of La. R.S. § 40:971. This felony drug charge was ultimately dismissed. (*Id.* at 4).

On July 6, 2023, Mr. Leblanc appeared for his arraignment, was assigned counsel, and pleaded not guilty to the § 922(g)(1) offense set forth in the Indictment. (Doc. 16). Based on Leblanc's strong local ties (he is a lifelong resident of Baton

3

Rouge), full time employment (at Walmart), and minimal drug use, (Doc. 7 at 2-4), the Magistrate Judge released Leblanc on conditions pending the outcome of this case. (Doc. 16; *see also* Doc. 12). Mr. Leblanc remains on pre-trial release, and there is no indication that he has violated any of the terms of the Magistrate Judge's conditional release order.

On August 14, 2023, Mr. Leblanc filed the instant motion to dismiss, arguing that, under *Bruen*, § 922(g)(1) is unconstitutional on its face and as applied to his conduct. (Doc. 22). On September 7, 2023, the Court permitted the Government to file an untimely opposition to Leblanc's motion. (Doc. 29; *see* Doc. 30). On October 10, 2023, the Court held a hearing, inviting "[t]he parties … to present argument and any evidence they deem necessary for the Court's consideration of [Leblanc's] Motion." (Doc. 23; Doc. 36). At the October 10 hearing, the parties each elected to present argument only, largely restating positions previously set forth in their papers. At the conclusion of the October 10 hearing, the Court took the matter under advisement. (Doc. 36). This Order follows.

## II.    LAW AND ANALYSIS

### A. Standard

Federal Rule of Criminal Procedure 12 allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).

Here, Mr. Leblanc pursues "as applied" *and* facial challenges to § 922(g)(1). "The distinction between as applied and facial challenges is sometimes hazy." *United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022) (citation omitted). Generally,

4

however, in an as applied challenge, the Court assesses whether a law with some permissible uses "is nonetheless unconstitutional as applied to [the defendant's] activity." *Spence v. Washington*, 418 U.S. 405, 414 (1974) (reversing defendant's criminal conviction); *see Street v. New York*, 394 U.S. 576, 594 (1969) (same). By contrast, in a facial challenge, the Court looks more broadly, assessing whether a law "could never be applied in a valid manner." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984).

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As such, "[f]acial challenges to the constitutionality of statutes should be granted sparingly and only as a last resort." *Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016) (quotation marks omitted). To put a finer point on it:

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records. Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450–51 (2008). From these fundamental tenets, it follows that "the lawfulness of the

particular application of the law should ordinarily be decided first." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 485 (1989).

### B. Discussion

The Government opposes Leblanc's motion, arguing principally that his *Bruen* challenge is foreclosed by pre-*Bruen* Fifth Circuit precedent, and that, even if not, § 922(g)(1) remains constitutional post-*Bruen*. (Doc. 30). The Government's constitutional defense is based on citations to a potpourri of obsolete laws compiled from various Colonial and Founding-era jurisdictions (cited below), intended to show that § 922(g)(1) is a permissible exception to the Second Amendment's "unqualified command" of an individual right to bear arms, *Bruen*, 597 U.S. at 17, because our Nation's history includes: "(1) laws stripping felons of political rights; (2) laws authorizing capital punishment and estate forfeiture for felons; and (3) laws disarming those deemed untrustworthy based on lack of adherence to the rule of law." (Doc. 30 at 10). The Court considers the Government's arguments (and supporting *evidence*) in turn.

### 1. Leblanc's Challenge Is Governed By *Bruen*

The Government expends considerable effort deflecting the Court's attention from Leblanc's *Bruen* challenge, insisting that it is foreclosed by pre-*Bruen* precedent. And for good reason: again, "the constitutionality of § 922(g)(1) *after Bruen* is not clear or obvious." *EtchisonBrown*, 2023 WL 7381451, at *3 (surveying authorities). The Court is not persuaded by this tack.

Not too long ago, Fifth Circuit law unambiguously held that "criminal prohibitions on felons (violent or nonviolent) possessing firearms" do not violate the

6

Second Amendment. *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *accord United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017). Indeed, the Government identifies no fewer than five pre-*Bruen* published Fifth Circuit opinions rejecting Second Amendment challenges to § 922(g)(1), dating back to *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003). (Doc. 30 at 4-5). The problem with *Darrington* (and everything to follow) is that its holding expressly (and exclusively) rests on *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001). *See Darrington*, 351 F.3d at 633–34. *Emerson*, in turn, employed a means-end analysis to uphold § 922(g)(8)'s prohibition against persons subject to domestic violence restraining orders from possessing guns, reasoning that to disarm a person posing "a credible threat to the physical safety of his wife (or child)" is "not inconsistent with the right of Americans generally to individually keep and bear their private arms." *Emerson*, 270 F.3d at 261. More recently, in *United States v. Rahimi*, the Fifth Circuit observed that *Bruen* "expressly repudiated the … means-end scrutiny … embodied in *Emerson*." *Rahimi*, 61 F.4th at 450. Going further, the Circuit held that even if *Bruen* "did not overtly overrule *Emerson*[, it] clearly fundamentally changed our analysis of laws that implicate the Second Amendment, rendering our prior precedent obsolete." *Id.; accord United States v. Daniels*, 77 F.4th 337, 341 (5th Cir. 2023) (explaining that *Bruen* "decisively rejected" the "means-end balancing" on which *Emerson* is based).

Obviously, this Court cannot ignore the Fifth Circuit's own interpretation of *Bruen's* impact on its prior Second Amendment jurisprudence. *Bruen* rendered *Emerson*—and, in turn, *Darrington* (and its progeny)—"obsolete," albeit implicitly.

7

*Rahimi*, 161 F.4th 450; *cf. Gahagan v. United States Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) ("Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent." (quotation marks omitted)). Pre-*Bruen* Fifth Circuit precedent does not control Leblanc's Second Amendment challenge to § 922(g)(1). *E.g.*, *United States v. Zelaya Hernandez*, --- F.Supp.3d ----, 2023 WL 4161203, at *2 (N.D. Tex. June 23, 2023) (Boyle, J.) ("Under [*Rahimi*], the Fifth Circuit left little room for precedent relating to 18 U.S.C. § 922(g)(1) to nonetheless survive."); *United States v. Barber*, 2023 WL 1073667, at *4 (E.D. Tex. Jan. 27, 2023) (applying *Bruen* to a defendant's motion challenging § 922(g)(1) and noting the "district courts' obligation to apply intervening Supreme Court precedent that conflicts with circuit authority" (citing authorities)); *accord United States v. Bullock*, --- F.Supp.3d ----, 2023 WL 4232309, at *29 (S.D. Miss. June 28, 2023) (Reeves, J.) ("*Bruen* expressly abrogated Fifth Circuit law." (citing *Bruen*, 597 U.S. at 19 n.4)).

### 2. *Bruen* Analysis

In this case, as always, the outcome of Leblanc's motion is dictated by three considerations: the law, the burden of proof, and the application of the same to the evidentiary record.

### a) Second Amendment Law Post-*Bruen*

Again, "*Bruen* clearly fundamentally changed our analysis of laws that implicate the Second Amendment." *Rahimi*, 61 F.4th at 450–51. "In place of means-end balancing, *Bruen* 'requires' us to interpret the Second Amendment in light of its original public meaning." *Daniels*, 77 F.4th at 341. Thus,

[t]o determine whether a modern firearms law is unconstitutional, we now proceed in two steps. *First*, we ask whether the Second Amendment applies by its terms. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Second*, we ask whether a given gun restriction is "consistent with the Nation's historical tradition of firearm regulation."

*Daniels*, 77 F.4th at 341 (quoting *Bruen*); *accord Rahimi*, 61 F.4th at 453.

As set forth more fully below, at the second step "the *government must affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19 (emphasis added).

The Government need not identify a "historical *twin*"; rather, a "well-established and representative historical *analogue*" suffices. The Supreme Court distilled two metrics for courts to compare the Government's proffered analogues against the challenged law: *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right. "Whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry."

As to the degree of similarity required, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." "Courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." On the other hand, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." The core question is whether the challenged law and proffered analogue are "relevantly similar."

When the challenged regulation addresses a "general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Moreover, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional."

*Rahimi*, 61 F.4th at 454 (cleaned up, quoting *Bruen*); *accord Daniels*, 77 F.4th at 354 ("We must use *Bruen*'s 'why' and 'how' analysis to assess whether the Founding-era restriction is relevantly similar to the modern one. We must ask: *Why* was the group considered dangerous at the Founding and therefore disarmed? And *why* does the modern law classify a person as presumptively dangerous? Is the comparison supported by the record? Furthermore, *how* did the historical regulation limit the rights of the dangerous class? And *how* does the modern regulation do so?").

### b) Burden Of Proof Post-*Bruen*

If, at the first step, "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and it is the Government's burden to affirmatively prove the constitutionality of the challenged regulation. *Daniels*, 77 F.4th at 341 (quoting *Bruen*, 597 U.S. at 17). "To carry its burden, the Government must point to 'historical precedent from before, during, and even after the founding that evinces a comparable tradition of regulation.'" *Rahimi*, 61 F.4th at 454 (alterations omitted; quoting *Bruen*, 597 U.S. at 27). Put differently, "the government has the burden to find and explicate the historical sources that support the constitutionality" of the challenged law, and "[o]nly by showing that the law does not tread on the historical scope of the right can the government 'justify its regulation.'" *Daniels*, 77 F.4th at 341, 344 (quoting *Bruen*, 597 U.S. at 17).

Moreover, when assessing whether the Government has risen to the task, the Court is "not obliged to sift the historical materials for evidence to sustain" the challenged law. *Rahimi*, 61 F.4th at 454 (quoting *Bruen*, 597 U.S. at 60). "That is the

Government's burden." *Id.* (alterations omitted).

> The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That legal inquiry is a refined subset of a broader historical inquiry, and it relies on various evidentiary principles and default rules to resolve uncertainties. For example, in our adversarial system of adjudication, we follow the principle of party presentation. Courts are thus entitled to decide a case based on the historical record compiled by the parties.

*Bruen*, 597 U.S. at 25 n.6 (quotation marks, alterations, and citations omitted).

### c) Application To The Evidentiary Record

#### 1) The Second Amendment's Plain Text Covers Leblanc's Conduct

Here, the first step of the *Bruen* analysis is easy. *Bruen* held unambiguously that the Second Amendment protects "an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 10. Mr. Leblanc stands accused of carrying a 9mm pistol in his car, which was only discovered after he peaceably consented to a vehicle search. "[H]andguns are weapons 'in common use' today for self-defense," *see id.* at 32, and no one disputes "that they fall within the scope of the [Second Amendment]," *Rahimi*, 61 F.4th at 454. Additionally, there is no evidence that Leblanc was using his firearm in an unlawful way at the time of his alleged offense—before, during, or after the gun's discovery. Rather, Leblanc's unlawful "conduct" was limited to merely having *possessed* the gun, due to his prior felony convictions.

The Second Amendment grants Leblanc "the right 'to keep' firearms, and 'possession' is included within the meaning of 'keep.' *Rahimi*, 61 F.4th at 454 (citing *Bruen*). As such, *Bruen*'s first step is satisfied, and the Second Amendment

presumptively protects Leblanc's right to possess and carry the handgun discovered in his car. *Bruen*, 597 U.S. at 33 ("The Second Amendment's plain text … presumptively guarantees … a right to 'bear' arms in public for self-defense."); *accord Rahimi*, 61 F.4th at 454 ("Rahimi's possession of a pistol and a rifle easily falls within the purview of the Second Amendment.").

### 2) The Government's Proposed Historical Analogues Are Not "Relevantly Similar" To § 922(g)(1)

Thus, we move to the second step, and the burden shifts to the Government to "justify [§ 922(g)(1)] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Rahimi*, 61 F.4th at 453 (quoting *Bruen*, 597 U.S. at 24); *accord Daniels*, 77 F.4th at 341.[1] This is no small feat.

---

[1] Twice since *Bruen* the Fifth Circuit has opined that even where a defendant's gun *conduct* is presumptively protected, the Second Amendment may not apply to certain "lawless" individuals—specifically "the mentally ill and felons, people who were historically stripped of their Second Amendment rights." *See Daniels*, 77 F.4th at 343 (quotation marks omitted); *accord Rahimi,* 61 F.4th at 452 ("*Heller* simply uses 'law-abiding, responsible citizens' as shorthand in explaining that its holding (that the amendment codifies an individual right to keep and bear arms) should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]'" (quoting *D.C. v. Heller*, 554 U.S. 570, 626 (2008)). Notably, in each instance, these statements from the Circuit stand apart from its analysis of whether the Government carried its burden to establish a historical tradition supporting the challenged gun regulation, suggesting that even *after Bruen*, "Congress and state legislatures have greater latitude to limit the gun liberties of the lawless" even in the *absence* of a suitable historical analogue. *See Daniels*, 77 F.4th at 342-43 (addressing first "whether the Second Amendment even applie[d]" to the defendant before examining whether tradition supports stripping gun rights from habitual marijuana users); *Rahimi*, 61 F.4th at 451-53 (addressing first whether the defendant fell "outside the ambit of the Second Amendment" before examining whether tradition supports stripping gun rights from persons subject to domestic violence restraining orders).

    At least one District Court has criticized the proposition that "felons and the mentally ill" are categorically excluded from Second Amendment protection, on the basis that it makes too much of Supreme Court dicta. *See Bullock*, 2023 WL 4232309, at *17-19; *accord Scroggins*, 599 F.3d at 451 (recognizing as dicta *Heller's* statement that the opinion should not "be taken

Even before *Bruen* threw down the gauntlet, jurists questioned whether this Nation's relevant history of gun regulation is consistent with prohibiting all felons from ever again possessing firearms. For example, in *United States v. Booker*, the U.S. Court of Appeals for the First Circuit observed:

> Though there may be some historical predicates for restricting the gun rights of those who have been convicted of a crime, the modern federal felony firearm disqualification law, 18 U.S.C. § 922(g)(1), is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified. Indeed, the current federal felony firearm ban differs considerably from the version of the proscription in force just half a century ago. Enacted in its earliest incarnation as the Federal Firearms Act of 1938, the law initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary, but extended to both felons and misdemeanants convicted of qualifying offenses. The law was expanded to encompass all individuals convicted of a felony (and to omit misdemeanants from its scope) several decades later, in 1961.

644 F.3d 12, 23–24 (1st Cir. 2011) (citations and footnotes omitted); *accord Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019) (observing that "the academic writing on the subject of whether felons were excluded from firearm possession at the time of the founding is 'inconclusive at best'" (alteration omitted; discussing authorities), *abrogated by Bruen*, 597 U.S. 1. More recently, in a 2019 *dissent* to a Seventh Circuit

---

to cast doubt on long-standing prohibitions on possession of firearms by felons"). Still, in this unsettled post-*Bruen* legal landscape, it would seem an obvious argument for upholding § 922(g)(1), if only because the Circuit continues to acknowledge that "felons and the mentally ill" might *not* be entitled to the full scope of Second Amendment protections. *Daniels*, 77 F.4th at 343; *Rahimi,* 61 F.4th at 452. Nonetheless, the Court does not address here whether the Second Amendment "even applies" to Leblanc—an undisputed felon—because the Government has not separately advanced the argument, thus forfeiting it to the principles of party presentation and waiver. *See Bruen*, 597 U.S. at 25 n.6; *Doe v. Bd. of Supervisors of Univ. of Louisiana Sys.*, 650 F. Supp. 3d 452, 477 (M.D. La. 2023) (Jackson, J.) ("[T]his Court has repeatedly admonished that it will not speculate on arguments that have not been advanced, or attempt to develop arguments on a party's behalf." (citing authorities)).

decision rejecting a Second Amendment challenge to § 922(g)(1)—a dissent that has gained considerable attention post-*Bruen*—then Circuit Judge (now Justice) Barrett observed that "at least thus far, scholars have not been able to identify" *any* Founding-era laws "explicitly imposing—or explicitly authorizing the legislature to impose" permanent disarmament of all felons. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting).

Indeed, until recently the Government *itself* "advanced the position that early American history did not support felon disarmament." *Bullock*, 2023 WL 4232309, at *28.

> In 2011, for example, the [Government] told Judges on the U.S. Court of Appeals for the Fourth Circuit that "as for convicted criminals, Colonial societies do not appear to have categorically prohibited their ownership of firearms." Brief of Appellee, *United States v. Staten*, No. 10-5318, 2011 WL 1542053, at *25 (4th Cir. Apr. 25, 2011). Similarly, in a case pending before the U.S. Court of Appeals for the First Circuit, the government told the court that "18 U.S.C. § 922(g)(1) is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified." Brief of Appellee, *United States v. Pettengill*, No. 10-2024, 2011 WL 1977759, at **27-28 (1st Cir. May 13, 2011).

*Id.* (alterations omitted).

And, of course, the debate regarding whether America's historical tradition supports stripping *all* felons—violent and nonviolent alike—of *all* Second Amendment protections has only intensified since *Bruen*.[2] Still, the Fifth Circuit has

---

[2] *Compare Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 106 (3d Cir. 2023) (sustaining as-applied challenge to § 922(g)(1) where Government failed to show "that the Nation's historical tradition of firearms regulation supports depriving [a non-violent felon] of his Second Amendment right to possess a firearm"); *Bullock*, 2023 WL 4232309, at *31 (same, as applied to violent felon); *with United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074,

not weighed in, except to say that "the constitutionality of § 922(g)(1) after *Bruen* is not clear or obvious." *EtchisonBrown*, 2023 WL 7381451, at *3.[3]

So it falls to this Court to determine whether the Government has carried its burden in this case. Despite having been expressly invited to present *evidence* to support its position that tradition justifies § 922(g)(1), (Doc. 23), the Government did not enlist a historian to testify on the historical analogues, if any, to modern felon disarmament. Nor did the Government even secure amicus briefs from historians discussing the issue. These omissions are frustrating. This Court is *not* an arbiter of history (or even an expert in the field); its role is to make legal rulings "upon a record produced by the parties' own presentations." *Bullock*, 2023 WL 4232309, at *16. And even if these failures are *consistent* with the Government's feeble approach to defending federal gun regulations against *Bruen* challenges (to date at least), they

---

at *2 (7th Cir. Sept. 22, 2022) (dismissing violent felon's challenge to § 922(g)(1) as "frivolous": "Gonzalez's offense—attempted murder—was violent, and we are aware of no authority supporting an argument that someone in his position historically had the right to possess a gun. Thus, it would be frivolous to argue that § 922(g)(1) is unconstitutional as applied to him."); *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) (rejecting non-violent drug offender's challenge to § 922(g)(1) because he was "not a law-abiding citizen, and history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society"); *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023) (holding that pre-*Bruen* Circuit precedent upholding § 922(g)(1) was not abrogated by *Bruen* and controlled post-*Bruen* challenge to § 922(g)(1) because, in *Bruen*, "six Justices reaffirm[ed] the *Heller* language," and the Court "apparent[ly] approv[ed] 'shall-issue' regimes and related background checks").

[3] To be sure, the Fifth Circuit has already rejected approximately one dozen "plain error" challenges to § 922(g)(1). *E.g.*, *United States v. Forbito*, No. 22-11026, 2023 WL 8274528, at *8 (5th Cir. Nov. 30, 2023) (citing cases). Unfortunately, these decisions offer minimal guidance regarding *Bruen's* application to § 922(g)(1) because they are all unpublished, per curiam opinions expressly acknowledging the "ambiguity of *Bruen's* application to § 922(g)(1), and the differing conclusions drawn by other circuit's contemplating the very issue." *Id.* In other words, not one of the Circuit's prior "plain error" decisions applies *Bruen's* history and tradition analysis to § 922(g)(1).

are also surprising in light of recent decisions highlighting the Government's slipshod efforts, and *sustaining* as-applied challenges to § 922(g)(1). *E.g.*, *id.*, at *15 ("The Department of Justice admits that in none of its proffered cases did a district court decide the [constitutionality of § 922(g)(1) post-*Bruen*] with assistance of a professional historian. That is puzzling because such assistance could have come in several forms.").

Instead, at great risk, the Government attempts to meet its burden by presenting nine pages of selective citations to various law review articles and non-binding authorities intended to show three potential historical analogues to justify disarmament of Leblanc: "(1) laws stripping felons of political rights; (2) laws authorizing capital punishment and estate forfeiture for felons; and (3) laws disarming those deemed untrustworthy based on lack of adherence to the rule of law." (Doc. 30 at 10). That is, the Government has once again engaged in its own version of "law office history," or "history lite," ignoring that essentially the same source materials have already been debunked, and can even "be cherry-picked in the exact opposite direction—to support *granting* … [D]efendant's motion to dismiss." *See Bullock*, 2023 WL 4232309, at *24 (quoting *See* Gordon S. Wood, Scott D. Gerber, *The Supreme Court and the Uses of History*, 39 OHIO N.U. L. REV. 435, 446 (2013)). Still, the Government alone is the master of its defense, *Bruen*, 597 U.S. at 25 n.6, and the Court faithfully considers the "evidence" it has presented to justify § 922(g)(1).

> **a. Founding era laws stripping felons of "political" rights were not motivated by the same concerns as § 922(g)(1), failing *Bruen's* "why" axis**

16

First, the Government posits that § 922(g)(1) passes muster because at the Founding, various "political" (or "civic") rights—including service on juries, voting, holding public office, *and* (according to the Government) the right "to bear arms"— could be stripped of citizens as "a legitimate consequence of a felony conviction." (Doc. 30 at 11 (quoting *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in part)). Certainly, "history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting) (citing authorities). But this analogy falls short because "*Heller* … expressly rejects the argument that the Second Amendment protects a purely civic right." *Id.* at 463. As explained by now-Justice Barrett:

> [*Heller*] squarely holds that "the Second Amendment confer[s] *an individual right* to keep and bear arms," *Heller*, 554 U.S. at 595 (emphasis added), and it emphasizes that the Second Amendment is rooted in the individual's right to defend himself—*not* in his right to serve in a well-regulated militia, *id.* at 582–86. The "civic rights" approach runs headlong into both propositions. *See Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 371 (3d Cir. 2016) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]his virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre-*Heller* interpretations of the Second Amendment by proponents of the 'sophisticated collective rights model' who *rejected* the view that the Amendment confers an individual right and instead characterized the right as a 'civic right....' " (citation omitted)). The parties have introduced no evidence that virtue exclusions ever applied to individual, as opposed to civic, rights. And if virtue exclusions don't apply to individual rights, they don't apply to the Second Amendment.

*Id.* (footnote omitted).

Here, again, the Government has presented no evidence that virtue exclusions ever applied to *individual* rights, which (now) undeniably include the Second

Amendment's guarantee of the right to keep and bear arms. *Heller*, 554 U.S. at 595. Translated, the Government's first proposed analogue fails *Bruen's* "why" axis: Founding era laws stripped felons of "political"/"civic" rights because these collective rights were reserved for "virtuous" citizens; but the right to bear arms is an individual right, and the Government has presented no evidence here establishing a Founding era tradition of imposing virtue requirements on individual rights.

> **b. Colonial era laws punishing felons with death did not operate in the same fashion as § 922(g)(1), failing *Bruen's* "how" axis**

Next, the Government directs the Court to Colonial era laws imposing the most severe penalties—death and estate forfeiture—on violent and non-violent felonies alike, observing that "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." (Doc. 30 at 15 (quoting *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)). Thus, the Government reasons, "'tradition and history' show that 'those convicted of felonies are not among those entitled to possess arms' under the Second Amendment." (*Id.* (quoting *Medina*, 913 F.3d at 158, 160).

Putting aside the Government's *ipse dixit*, *and* that the case it cites—*Medina v. Whitaker*—suffers the analytical shortcomings rejected in *Bruen*, *see Medina*, 913 F.3d at 160–61 ("A prohibition on firearm ownership, like these other disabilities, is a reasonable consequence of a felony conviction that the legislature is entitled to impose without undertaking the painstaking case-by-case assessment of a felon's potential rehabilitation."), this analogy also suffers serious flaws. First, as noted by then-Circuit Judge Barrett, the historical record shows that "[t]hroughout the

18

seventeenth and eighteenth centuries, capital punishment in the colonies was used 'sparingly,' and property crimes including variations on theft, burglary, and robbery"—Leblanc's offense here—"'were, on the whole, not capital.'" *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) (quoting Lawrence M. Friedman, Crime and Punishment in American History 42 (1993)). Even if at one time England put all felons to death, "an 'ancient' practice that had become 'obsolete in England at the time of the adoption of the Constitution' and never 'was acted upon or accepted in the colonies'" is *not* an acceptable analogue to modern firearm regulations. *Bruen*, 597 U.S. at 35 (quoting *Dimick v. Schiedt*, 293 U.S. 474, 477 (1935)).

Moreover, according to none-other than James Madison, "'felony' was 'a term of loose signification even in the common law of England,' but more so in the States where 'the meaning of the term was not precisely the same in any two of the States; and varied in each with every revision of its criminal laws." *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) (cleaned up; quoting The Federalist No. 42, at 228 (J. R. Pole ed., 2005)).

Summarizing our Nation's early history of felony punishment, now-Justice Barrett explained:

> The upshot … for present purposes is that the consequences of a felony conviction were not as categorically severe as the governments [sic] suggest. Capital punishment was less pervasive than one might think. Outside the capital context, civil death applied exclusively to life sentences and only if authorized by statute—and even then, it was more modest than the ancient version because the convict retained some rights. Felons serving a term of years did not suffer civil death; their rights were suspended but not destroyed. In sum, a felony conviction and the loss of all rights did not necessarily go hand-in-hand.

Because they did not go hand-in-hand, the argument that the severity

of punishment at the founding implicitly sanctions the blanket stripping of rights from all felons, including those serving a term of years, is misguided. Those who ratified the Second Amendment would not have assumed that a free man, previously convicted, lived in a society without any rights and without the protection of law. This is not to say that felons could not lose rights under another theory. Indeed, state legislatures did explicitly exclude felons from the enjoyment of particular [civic] rights. But history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class.

*Id.* at 461 (citations omitted).

More recently (post-*Bruen*), the en banc Third Circuit offered a slightly different rejection of the same historical evidence as support for § 922(g)(1), based on the fundamentally different nature of the penalty at issue (death versus lifetime disarmament):

That Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition. The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed. As one of our dissenting colleagues notes, a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society. That aptly describes Range's situation. So the Government's attempt to disarm Range is not "relevantly similar" to earlier statutes allowing for execution and forfeiture.

*Range*, 69 F.4th at 105 (citations omitted). At least one District Court in this Circuit has taken a similar tack, concluding: "the value of historical analogues that draw on the harshness of felony penalties *per se* is limited: 18 U.S.C. § 922(g)(1) relies upon a prior conviction and one's *status* as a felon to deprive his right to possess weapons after *returning to society*. That a felon could not possess a weapon while being

20

punished, therefore, is of questionable relevance." *Zelaya Hernandez*, 2023 WL 4161203, at \*5).

Here, Mr. Leblanc has also returned to society. He is gainfully employed, and may now even vote (a right that was stripped of him during his imprisonment). For the same reasons set forth by Justice Barrett in her *Kanter* dissent, the Third Circuit in *Range*, and the Northern District of Texas in *Zelaya Hernandez*, this Court finds that the Government's second proposed analogue fails *Bruen's* "how" axis: not all felons were put to death or permanently stripped of their "estates" at the Founding, enabling at least some felons to re-possess firearms after they served their punishments. Founding era laws punishing some felons with death are not a sufficient basis to justify permanent disarmament of all felons under § 922(g)(1).

> ### c. The specific Colonial and Founding era laws cited by the Government to support disarming untrustworthy and dangerous persons were not motivated by the same concerns as § 922(g)(1), failing *Bruen's* "why" axis

This leaves only the Government's proffer of Colonial and Founding era laws disarming "untrustworthy" and "dangerous" persons. (Doc. 30 at 15). Specifically, the Government cites the 1689 English Bill of Rights (disarming "Papists"), and a hodgepodge of Colonial era laws also disarming Catholics, Native Americans, persons of African descent, libelers, and the otherwise "disaffected." (*Id.* at 15-16). The Government asserts that these laws justify contemporary disarmament of felons because they show that "at the time of the founding, legislatures had the authority to disarm even non-violent people whom they deemed not to be law-abiding and

21

trustworthy." (Doc. 30 at 17). In further support, the Government cites *United States v. Jackson*, a recent Eighth Circuit decision rejecting a non-violent drug offender's *Bruen* challenge to § 922(g)(1), concluding (based on the same historical references) that Colonial era "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1)." *Jackson*, 69 F.4th at 505.

Would that the Government spent more time on this section of its brief, and paid closer attention to the relevant post-*Bruen Fifth* Circuit authorities—*Rahimi* and *Daniels*—which characterize Colonial laws disarming Catholics, Native Americans, and enslaved persons as, at *best*, "dubious" justification for contemporary disarmament laws. *See Rahimi*, 61 F.4th at 457. Of course, *Rahimi* and *Daniels* did *not* address whether our Nation's history supports disarming felons: rather, *Rahimi* held that there is no historical analogue for disarming persons subject to domestic violence retraining orders (rendering § 922(g)(8) unconstitutional under *Bruen*); and *Daniels* held that the Government failed to show any historical analogue for disarming habitual drug users (rendering § 922(g)(3) unconstitutional as applied to the defendant). But in each case, the Fifth Circuit addressed the *same* danger-based analogues advanced by the Government here, and *rejected* them as a basis for sustaining contemporary disarmament laws for reasons that are equally applicable in this case.

Specifically, in *Rahimi*, the Fifth Circuit explained:

> These laws disarmed people thought to pose a threat to the security of
> the state due to their perceived lack of loyalty or societal status. "While
> public safety was a concern, most disarmament efforts were meant to
> prevent armed rebellions. The early Americans adopted much of that
> tradition in the colonies." Greenlee, supra, at 261.
>
> But we question at a threshold level whether colonial and state laws
> disarming categories of "disloyal" or "unacceptable" people present
> tenable analogues to § 922(g)(8). Laws that disarmed slaves, Native
> Americans, and disloyal people may well have been targeted at groups
> excluded from the political community—*i.e.*, written out of "the people"
> altogether—as much as they were about curtailing violence or ensuring
> the security of the state. Their utility as historical analogues is therefore
> dubious, at best. In any event, these laws fail on substance as analogues
> to § 922(g)(8), because out of the gate, why they disarmed people was
> different. The purpose of laws disarming "disloyal" or "unacceptable"
> groups was ostensibly the preservation of political and social order, not
> the protection of an identified person from the threat of "domestic gun
> abuse," *McGinnis*, 956 F.3d at 758, posed by another individual. Thus,
> laws disarming "dangerous" classes of people are not "relevantly
> similar" to § 922(g)(8) such that they can serve as historical analogues.

*Rahimi*, 61 F.4th at 457.

In *Daniels*, the Fifth Circuit continued the same tack, emphasizing again that
"[w]e must use *Bruen's* 'why' and 'how' analysis to assess whether the Founding-era
restriction is relevantly similar to the modern one." *Daniels*, 77 F.4th at 354. And,
again, the Government's proposed danger-based analogues *failed* that test:

> Applying *Bruen's* framework to the proffered analogues, it follows that
> the government's theory of danger-based disarmament falls apart. The
> government identifies no class of persons at the Founding (or even at
> Reconstruction) who were "dangerous" for reasons comparable to
> marihuana users. Marihuana users are not a class of political traitors,
> as British Loyalists were perceived to be. Nor are they like Catholics
> and other religious dissenters who were seen as potential
> insurrectionists. And even if we consider the racially discriminatory
> laws at the Founding, Daniels is not like the minorities who the
> Founders thought threatened violent revolt.

The government suggests that, in the spirit of the drafts of the Second Amendment and the Militia Act, marihuana users threaten the public "peace." But at the time of the Founding, that notion referred specifically to violence or rebellion, not generalized public harm. And § 922(g)(3) is not limited to those with a history of violent behavior—not all members of the set of "drug users" are violent. As applied in this case, the government has not shown how Daniels's marihuana use predisposes him to armed conflict or that he has a history of drug-related violence.

…

The government asks us to set aside the particulars of the historical record and defer to Congress's modern-day judgment that Daniels is presumptively dangerous because he smokes marihuana multiple times a month. But that is the kind of toothless rational basis review that *Bruen* proscribes. Absent a comparable regulatory tradition in either the 18th or 19th century, § 922(g)(3) fails constitutional muster under the Second Amendment

*Daniels*, 77 F.4th at 354–55. And the Fifth Circuit did *not* stop there. Indeed, *Daniels* went on to cite (with evident *approval*) the Third Circuit's recent en banc *Range* decision, which rejected the same danger-based analogues as modern justification for disarming a non-violent felon:

The en banc Third Circuit recently followed [*Bruen's* "why" and "how" analytical] approach in *Range*. Facing a challenge to § 922(g)(1), the felon-in-possession statute, the court acknowledged Founding-era evidence for disarming the dangerous. But it required the government to "analogize historically disarmed groups to the defendant and his individual circumstances." "That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that [a defendant] is part of a similar group today." The Third Circuit ultimately held that § 922(g)(1) was unconstitutional as applied to a non-violent felon.

*Daniels*, 77 F.4th at 354 n. 42 (cleaned up, *Range*, 69 F.4th at 104-05).

Having presented the same danger-based analogues here, the Government's proffer once again fails *Bruen's* "why" axis. Again, the Government has put forward no evidence whatsoever that the concerns motivating Colonial era disarmament of

"Loyalists, Native Americans, Quakers, Catholics, and Blacks"—*i.e.*, collective rebellion—provide the impetus for modern disarmament of felons. *See Daniels*, 77 F.4th at 354 & n.42. And, as applied to this case, the Government has failed even to present any evidence (or argument) that Mr. Leblanc's prior felony convictions make him a specific threat to "the public peace" by predisposing him to "violence." *See id.* Instead, the Government's defaults to arguments rooted in notions of "generalized public harm." *See id.* This is not enough to show that § 922(g)(1) is consistent with this Nation's historical tradition. *Id.* Thus, the Government's third and final historical justification for  modern disarmament of felons under § 922(g)(1) also fails.

In sum, the Government has failed to carry its burden to "find and explicate the historical sources that support the constitutionality" of § 922(g)(1) as applied to Leblanc, *Daniels*, 77 F.4th at 344, and Leblanc's motion to dismiss will be granted on this basis. *E.g.*, *Bullock*, 2023 WL 4232309, at *31 (sustaining as-applied challenge and granting violent felon's motion to dismiss indictment charging violation of § 922(g)(1), where "the prosecution … failed to establish a 'historical tradition' supporting lifetime criminalization of his possession of a firearm" (quotation and alterations omitted)); *cf. Daniels*, 77 F.4th at 355 (sustaining as-applied challenge to § 922(g)(3) where Government failed to carry its burden to show historical tradition of disarming drug users, but declining to "invalidate the statute in all its applications").

### 3) A Ruling On Leblanc's Facial Challenge Is Not Required And Would Be Speculative On The Present Record

As stated, facial challenges are disfavored because they inherently risk

"premature interpretation of statutes on the basis of factually barebones records."
*Washington State Grange*, 552 U.S. at 450 (quotation marks omitted). Simply because
the Government has not shown a "relevantly similar" historical tradition to justify
§ 922(g)(1) in this case does not mean that it will fail again in the future. Notably,
Mr. Leblanc was previously convicted of Louisiana armed robbery—undeniably a
"serious violent felony" under federal *and* state law, *e.g.*, *United States v. Parker*, 3
F.4th 178, 181 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 818 (2022); *accord* La. R.S. §
14:2(B)(21)—and there appears to be at least *some* historical support for banning
*violent* felons from possessing firearms.

> Again, the Court defers to Justice Barrett's *Kanter* dissent:
>
> In recommending that protection for the right to arms be added to the
> Constitution, [the New Hampshire, Massachusetts, and Pennsylvania
> ratifying conventions included] limiting language arguably tied to
> criminality.
>
> A majority of the New Hampshire convention recommended that a bill
> of rights include the following protection: "Congress shall never disarm
> any citizen, *unless such as are or have been in actual rebellion*." In the
> Massachusetts convention, Samuel Adams proposed to protect the right
> to arms with the following language: "And that the said Constitution be
> never construed to authorize Congress to … prevent the people of the
> United States, *who are peaceable citizens*, from keeping their own arms."
> Finally, the influential Pennsylvania Minority suggested an addition
> stating: "That the people have a right to bear arms for the defense of
> themselves and their own State or the United States, or for the purpose
> of killing game; and no law shall be passed for disarming the people or
> any of them *unless for crimes committed, or real danger of public injury
> from individuals* …." On the basis of these three proposals some conclude
> that "[a]ll the ratifying convention proposals which most explicitly
> detailed the recommended right-to-arms amendment excluded
> criminals and the violent." *See, e.g.*, Kates, 82 Mich. L. Rev. at 266.

*Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting) (citations omitted).

Of course, Justice Barrett went on to express doubts about the utility of these historical analogues, given that none made its way into the Second Amendment, only one (New Hampshire's) carried a majority of its convention, and similar limitations did *not* appear in the recommendations of parallel state conventions. *See id.* at 455; *cf. Bruen*, 142 S. Ct. at 2142 ("[W]e *doubt* that three colonial regulations could suffice to show a tradition of public-carry regulation."); *Daniels*, 77 F.4th at 347 (holding that three Reconstruction era laws prohibited carrying firearms while intoxicated were insufficient to justify § 922(g)(1)); *Rahimi*, 61 F.4th at 458 (holding that four Colonial era "going armed" regulations were insufficient to justify § 922(g)(8)). Still, these proposals are a start, indicating "some common if imprecise understanding at the Founding regarding the boundaries of a right to keep and bear arms." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (quoting Marshall, 32 Harv. J.L. & Pub. Pol'y at 713).[4]

Given the ambiguity (to date) of the relevant historical evidence supporting categorical disarmament of felons, the "bare bones" record put forward by the Government here, and that Mr. Leblanc has achieved relief through his as-applied challenge, the Court will exercise restraint and defer ruling on Leblanc's facial challenge to § 922(g)(1). *See Washington State Grange*, 552 U.S. at 450. "In plain

---

[4] To be clear, the Court expresses no opinion and makes no ruling as to whether these historical authorities from New Hampshire, Massachusetts, and Pennsylvania—or any others of the same like—may yet justify § 922(g)(1), because the Government did *not* include them among its *evidence* in this case, or even reference them in its argument. Again, the principles of party presentation and waiver do not permit the Court to develop the Government's case on its behalf. *Supra* n.1 (citing *Bruen*, 597 U.S. at 25 n.6; *Doe*, 650 F. Supp. 3d at 477 n.13).

English, that means that the charge against Mr. [Leblanc] will be dismissed today, and the federal government may continue to prosecute other persons for violating § 922(g)(1)." *See Bullock*, 2023 WL 4232309, at *31.[5]

## III.    CONCLUSION

The Court's decision today is a narrow one. Mr. Leblanc's as-applied challenge succeeds because the Government has not marshaled the historical evidence required to carry its burden of justifying § 922(g)(1), as the Supreme Court now mandates. The Court need not go any further for present purposes, and to do so would violate fundamental principles of conservatism and judicial restraint. *Washington State Grange*, 552 U.S. at 450.

Accordingly,

**IT IS ORDERED** that Leblanc's as applied challenge to § 922(g)(1) be and is hereby **SUSTAINED**.

**IT IS FURTHER ORDERED** that Leblanc's **Motion To Dismiss The Indictment (Doc. 22)** be and is hereby **GRANTED IN PART**, consistent with the

---

[5] The Government's effort to defend § 922(g)(1) in this case is (again) undeniably "disappointing," *Bullock*, 2023 WL 4232309, at *15, particularly because it has received multiple shots across its bow (from inside and outside the Fifth Circuit) warning that more is required to justify contemporary disarmament laws post-*Bruen*. *E.g.*, *Daniels*, 77 F.4th at 344; *Rahimi*, 61 F.4th at 461; *Bullock*, 2023 WL 4232309, at *31; *see also Range*, 69 F.4th at 106. Given the sheer volume of § 922(g)(1) prosecutions each year, it is baffling that the Government would not take more seriously its charge to (timely) brief *and* put forward *evidence* to support its case. More than 18 months after *Bruen*, and still not even one history expert to explicate our Nation's tradition of firearms regulation?

But the Government remains the master of its defense. *Bruen*, 597 U.S. at 25 n.6. The next *Bruen* challenge to § 922(g)(1) is right around the corner (Mr. LeBlanc is but the first of many § 922(g)(1) defendants in this District to invoke *Bruen*). The Government would do well to re-visit its strategy, and *soon*, to ensure that its "justification" of § 922(g)(1) in these additional cases does not already suffer the same deficiencies identified in this Order.

relief set forth in this Order.

**IT IS FURTHER ORDERED** that the Indictment returned against Defendant on May 24, 2023 (Doc. 1) be and is hereby **DISMISSED WITH PREJUDICE**.

Final judgment will be entered separately.

Baton Rouge, Louisiana, this **19th** day of December, 2023

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**